**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) **Case No. : 8-14-cv-2153-T27-** |
| | ) **EAJ** |
| v. | ) |
| | ) **FIRST AMENDED** |
| SUN BRIGHT VENTURES LLC; CITADEL ID | ) **COMPLAINT FOR** |
| PRO LLC; BENJAMIN TODD WORKMAN; | ) **PERMANENT INJUNCTION** |
| TRIDENT CONSULTING PARTNERS LLC; and | ) **AND OTHER EQUITABLE** |
| GLENN ERIKSON, | ) **RELIEF** |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission") alleges:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade

Commission Act ("FTC Act"),  15 U.S.C. § 53(b) and 57b, and the Telemarketing and

Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-08, to

obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of

contracts, restitution, refund of monies paid, disgorgement of ill-gotten monies, and other

equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act,

15 U.S.C. § 45(a), and in violation of the FTC's Telemarketing Sales Rule ("TSR"), 16

C.F.R. Part 310.

**JURISDICTION AND VENUE**

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331,

1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(c), and 6105(b).

3.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (b)(3), (c)(1),

(c)(2), (d), and 15 U.S.C. § 53(b).

## SUMMARY OF THE CASE

4.      Defendants targeted seniors using deceptive telemarketing calls to withdraw money from their bank accounts without authorization.  Defendants obtained consumers' bank account information by misrepresenting their affiliation with the United States government and offering consumers free products or services. Using remotely created checks, defendants then illegally debited consumers' bank accounts.  Consumers often learned of these unauthorized debits only after noticing them on their bank statements.  Defendants made millions of dollars in unauthorized debits without providing consumers with any product or service in exchange.

## PLAINTIFF

5.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces, *inter alia*, Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair and deceptive acts or practices in or affecting commerce, and the Telemarketing Act, 15 U.S.C. §§ 6101-6108, and the TSR, which prohibits deceptive and abusive telemarketing acts or practices.

6.      The FTC is authorized to initiate federal district court proceedings by its own attorneys, to enjoin violations of the FTC Act and the TSR, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b, 6102(c), and 6105(b).

## DEFENDANTS

7.      Defendant Sun Bright Ventures LLC ("Sun Bright Ventures") is a Florida limited liability company with its principal place of business in Riverview, Florida.  Sun Bright Ventures transacts or has transacted business in this District and throughout the United States.

8.     Defendant Citadel ID Pro LLC ("Citadel ID Pro"), is a Florida limited liability company with its principal place of business at 4511 North Himes Avenue, Suite 200, Tampa, Florida.  Citadel ID Pro transacts or has transacted business in this District and throughout the United States.

9.     Defendant Benjamin Todd Workman ("Workman") is a resident of Riverview, Florida.  He is the Managing Member of Sun Bright Ventures and Citadel ID Pro. At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Sun Bright Ventures and Citadel ID Pro. Workman resides in this District and in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

10.     Defendant Trident Consulting Partners LLC ("Trident Consulting") is a Florida limited liability company with its principal place of business at 701 South Howard Avenue, Suite 106-319, Tampa, Florida.  Trident Consulting transacts or has transacted business in this District and throughout the United States.

11.     Defendant Glenn Erikson ("Erikson") is a resident of Tampa, Florida.  He is the sole member of Trident Consulting.  At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Trident Consulting.  Erikson resides in this District and in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

**COMMERCE**

12.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in the offering for sale and the sale of goods or services via

3

telephone, in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

13.     Beginning in September 2013, Defendants debited consumers' bank accounts without consumers' express informed consent, and sometimes without their knowledge. Since September 2013, Defendants have deposited more than $3 million into their own bank accounts by illegally debiting the bank accounts of thousands of consumers, many of whom are senior citizens.

14.     Defendants engaged in a deceptive telemarketing campaign to obtain consumers' personal bank account information, including their bank account and routing numbers.

15.     Defendants' representatives often called consumers with whom they had no existing business relationship and whose telephone numbers are on the National Do Not Call Registry.

16.     In some instances, Defendants debited consumers' bank accounts without having any communications with them at all.

17.     During a typical telemarketing call, Defendants' representatives made several false representations.  In numerous instances, they misrepresented that they were calling on behalf of, or were affiliated with, Medicare, a United States government program.

18.     In numerous instances, Defendants' representatives stated that, because of new changes to health care, they were providing consumers with a new Medicare card, or a package of information related to their Medicare benefits.  In fact, Defendants did not provide consumers with any products or services related to Medicare or any other medical benefits, nor did they provide any identity theft product or service.

19.     During these calls, Defendants' representatives asked consumers for their

personal information, including their name, address, and bank account information.  In numerous instances, the representatives implied or stated that they already had the consumer's information, and that they were "confirming" this information in order to verify consumers' identities.

20.     In numerous instances, Defendants' representatives also mislead consumers as to the cost of their purported products and services.  These representatives typically did not disclose that consumers' bank accounts would be debited, and in numerous instances, they stated that there was no cost for their services.  Defendants' representatives also engaged in similar conduct under the guise of offering consumers an identity theft protection service.

21.     In some instances, Defendants' representatives also implied that consumers had to give this information in order to continue receiving their Medicare benefits.  In truth, Defendants had no way of knowing or impacting the status of consumers' Medicare benefits.

22.     Based on these misrepresentations, consumers felt pressured to provide the requested information, including their bank account numbers.  Some consumers believed that the Defendants already had their personal information and were unaware that their bank accounts would be debited.

23.     In some cases, Defendants' representatives made a recording of the consumer providing their personal information.  In numerous instances, Defendants made false and misleading statements to induce consumers to disclose this information.  For example, Defendants misrepresented that the products and services were free, that Defendants would not debit consumers' accounts, and that the consumers' information would be used only to verify their identity.  Furthermore, in the recordings, consumers typically did not expressly authorize their bank accounts to be debited.

24.     Within a few weeks of speaking with Defendants' representatives, consumers often discovered that their bank accounts had been debited for approximately $448 through a

remotely created check ("RCC").

25.     An RCC is a form of payment that serves the same function as a traditional check drawn on an account at a bank.  Traditional checks require the signature of the authorized signatory on the checking account (the payor), which must be verified by the paying bank.  By contrast, an RCC is an unsigned check that is created by the payee.  In place of the payor's signature, the RCC bears a statement indicating that the account holder authorized the check, such as "Pre-Authorized Check, No Signature Required," or "This draft is preauthorized by your depositor, no signature required."

26.     Many merchants use as a payment mechanism debits processed through the Automated Clearing House ("ACH") network.  Debits processed through the ACH network, a nationwide inter-bank electronic network, are subject to the monitoring and operating rules of NACHA – The Electronic Payments Association ("NACHA"), a private self-regulatory trade association.  NACHA closely monitors electronic transactions processed through the ACH network.  Among other things, NACHA monitors the levels at which attempted debits are returned by consumers or their banks back through the network.

27.     In recent years, fraudulent merchants have increasingly migrated to the use of other, less monitored, payment alternatives, such as RCCs.  RCCs clear through the regular check clearing system.  However, because RCCs are not subject to the kind of monitoring and oversight that ACH transactions are subject to by NACHA, they have become an attractive payment mechanism for merchants engaged in unauthorized debiting of consumer accounts.

28.     As part of their scam, Defendants created RCCs in consumers' names made out to one of the corporate Defendants.  Defendants then deposited the RCCs into their bank accounts.  Defendants' banks then debited the consumers' bank accounts for the specified amount.  Consumers were not notified of the impending debit.

29.     In some instances, Defendants debited consumers' bank accounts without calling consumers at all. These consumers' accounts were debited despite the fact that they had never spoken to or even heard of Defendants or their representatives.

30.     The RCCs that Defendants created sometimes contained a memo line indicating that consumers were paying for "ID Theft Protection/Medical Benefits." However, many consumers never discussed any kind of identity theft protection or medical benefits service with Defendants.  And many, if not all, consumers whose bank accounts Defendants debited received no identity theft protection or medical benefits.

31.     In numerous instances, consumers, many of whom are seniors, and some of whom suffer from dementia or other cognitive impairments, did not notice Defendants' unauthorized debits on their bank statements.

32.     Consumers who did notice the debits often attempted to complain to, and sought refunds directly from, Defendants.  Many consumers were never able to get in touch with Defendants, or were told they must call back after they had received their package of information. Some consumers were told that a refund would be processed, but it never came.

33.     Other consumers who noticed the debits complained to their own banks.  In response to such complaints, banks can reject or reverse the debit.  Such a rejection or reversal is referred to as a "return."

34.     The "return rate" reflects the percentage of all returns out of the total number of attempted debits. High return rates for RCCs (or other similar debits) can be indicative of unlawful practices, such as unauthorized debiting of consumer accounts.

35.     In determining what constitutes a "high" rate of return, a useful benchmark is the average industry rate of return in the ACH network.  Currently, neither the banking industry nor the Federal Reserve Bank maintains specific information about the average industry return rates for RCCs.

36.     However, NACHA does keep track of the average industry return rates for ACH debits to consumer accounts, which is a comparable consumer payment mechanism. According to NACHA data, the 2013 ACH average return rate was 1.42% for all debit transactions.

37.     Since September 2013, Defendants' debits of consumers' bank accounts have resulted in extremely high return rates.  The initial bank Defendants used to deposit their debits recorded a return rate of 68% between September 2013 and January 2014.  The bank subsequently terminated their relationship with Defendants.

**VIOLATIONS OF THE FTC ACT**

38.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

39.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.  Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

**COUNT I – Deceptive Representations Regarding Defendants' Affiliation**

40.     In numerous instances, Defendants represented, directly or indirectly, expressly or by implication, that they were contacting the consumer from, or on behalf of, or are otherwise affiliated with, one or more United States government entities.

41.     In truth and in fact, Defendants were not contacting the consumer from, or on behalf of, and are not otherwise affiliated with, any United States government entity.

42.     Therefore, Defendants' representations as set forth in Paragraph 40 of this Complaint were false and misleading and constituted a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

8

**COUNT II – Deceptive Representations Regarding the Need For and Use of**

**Consumers' Personal Information**

43.     In numerous instances, Defendants represented that they required consumers' personal information, including financial account information, to verify consumers' identities, and that this information would not be used to debit consumers' bank accounts.

44.     In truth and in fact, Defendants did not need consumers' personal information for verification purposes and Defendants instead used this information to debit consumers' bank accounts.

45.     Therefore, the making of the representation set forth in Paragraph 43 of this Complaint was false and misleading and constituted a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT III — Unfair Unauthorized Debits**

46.     In numerous instances, Defendants debited or caused the debiting of consumers' bank accounts without the consumers' authorization or express informed consent.

47.     Defendants' actions caused substantial injury to consumers that consumers could not reasonably avoid themselves and was not outweighed by countervailing benefits to consumers or competition.

48.     Therefore, Defendants' practices as described in Paragraph 46 of this Complaint constituted unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

**VIOLATIONS OF THE TELEMARKETING SALES RULE**

49.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices under the Telemarketing Act, 15 U.S.C. §§ 6101-6108. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and

amended certain sections thereafter. 16 C.F.R. Part 310.

50.     Defendants are "sellers[s]" or "telemarketer[s]" engaged in "telemarketing," and Defendants have initiated, or caused telemarketers to initiate, "outbound telephone call[s]" to consumers to induce the purchase of goods or services, as those terms are defined in the TSR, 16 C.F.R. § 310.2 (aa), (cc), and (dd)

51.     Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution. 16 C.F.R.§ 302(v).

52.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any of the following material information:

> a.     The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2)(i);
>
> b.     Any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2)(iii); or
>
> c.     A seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity. 16 C.F.R. § 310.3(a)(2)(vii).

53.     The TSR prohibits any seller or telemarketer from causing billing information to be submitted for payment, or collecting or attempting to collect payment for goods or services or a charitable contribution, directly or indirectly, without the customer's express verifiable authorization, except when the method of payment used is a credit card subject to protections of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*., and Regulation Z, 12 C.F.R. § 226, or a debit card subject to the protections of the Electronic Fund Transfer Act,

15 U.S.C. § 1693 *et seq*., and Regulation E, 12 C.F.R. § 205.  16 C.F.R. § 310.3(a)(3).  When an audio recording of the customer's express oral authorization is used to satisfy this requirement, the TSR requires that the recording must clearly evidence the customer's authorization of payment for the goods or services that are the subject of the telemarketing transaction and the customer's receipt of all of the following information:

a. The number of debits, charges, or payments (if more than one);

b. the date(s) the debit(s), charge(s), or payment(s) will be submitted for payment;

c. the amount(s) of the debit(s), charge(s), or payment(s);

d. the customer's name;

e. the customer's billing information, identified with sufficient specificity such that the customer understands what account will be used to collect payment for the goods or services or charitable contribution that are the subject of the telemarketing transaction;

f. a telephone number for customer inquiry that is answered during normal business hours; and;

g. the date of the customer's oral authorization.

16 C.F.R. § 310.3(a)(3)(ii).

54.    The TSR prohibits any seller or telemarketer from causing billing information to be submitted for payment, directly or indirectly, without the express informed consent of the customer. In any telemarketing transaction, the seller or telemarketer must obtain the express informed consent of the customer to be charged for the goods or services and to be charged using the identified account. 16 C.F.R. § 310.4(a)(7).

55.     The TSR prohibits telemarketers from initiating any outbound calls to a person when that person's telephone number is on the Do Not Call Registry. 16 CFR 310.4(b)(1)(iii)(B).

56.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT IV – Misrepresenting Affiliation with a Government Entity

57.     In numerous instances, in connection with the telemarketing of their purported goods or services, Defendants represented that they were affiliated with, or had the endorsement or sponsorship of Medicare, a United States government program.

58.     In truth and in fact, Defendants had no affiliation with Medicare or any United States government entity, and were not endorsed or sponsored by any such entity.

59.     Defendants' misrepresentations, as alleged in Paragraph 57, constituted deceptive telemarketing acts or practices that violated Section 310.3(a)(2)(vii) of the TSR, 16 C.F.R. § 310.3(a)(2)(vii).

### COUNT V – Misrepresenting Material Aspects

60.     In numerous instances, in connection with the telemarketing of their purported goods or services, Defendants misrepresented material aspects of the nature or central characteristics of the good or services offered.

61.     Defendants' misrepresentations, as alleged in Paragraph 60, constituted deceptive telemarketing acts or practices that violated Section 310.3(a)(2)(iii) of the TSR, 16 C.F.R. §310.3(a)(2)(iii).

### COUNT VI – Lack of Express Verifiable Authorization

62.     In numerous instances, in connection with the telemarketing of their purported

goods or services, Defendants caused billing information to be submitted for payment using a payment method other than a credit card subject to the protections of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*., and Regulation Z, 12 C.F.R. § 226, or a debit card subject to the protections of the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq*., and Regulation E, 12 C.F.R. § 205, without the consumer's express verifiable authorization.

63.     Defendants' failure to obtain express verifiable authorization, as alleged in Paragraph 62, constituted a deceptive telemarketing act or practice that violated Section 310.3(a)(3) of the TSR, 16 C.F.R. § 310.3(a)(3).

### COUNT VII – Lack of Express Informed Consent to Be Billed

64.     In numerous instances, in connection with the telemarketing of their purported goods or services, Defendants caused billing information to be submitted for payment without the express informed consent of the consumer.

65.     Defendants' failure to obtain express informed consent to be billed, as alleged in Paragraph 64, constituted a deceptive telemarketing act or practice that violated Section 310.4(a)(7) of the TSR, 16 C.F.R. § 310.4(a)(7).

### COUNT VIII – Calling Telephone Numbers on the National Do Not Call Registry

66.     In numerous instances, in connection with the telemarketing of their purported goods or services, Defendants initiated, or caused others to initiate, an outbound telephone call to a person's telephone number on the National Do Not Call Registry in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

67.     Defendants' conduct, as alleged in Paragraph 66, was an abusive telemarketing act or practice that violated Section 310.4(b)(1)(iii)(B) of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

### CONSUMER INJURY

68.     Consumers have suffered substantial injury as a result of Defendants'

violations of Sections 5(a) of the FTC Act and the TSR.  In addition, Defendants were unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

69.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

70.     Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violation of the TSR, including rescission and reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Federal Trade Commission, pursuant to Section 13(b) and 19 of the FTC Act, 15 U.S.C. § 53(b) and 57b, and Section 6(d) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

1.     Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including, but not limited to, temporary and preliminary injunctions, and an order freezing assets;

2.     Enter a permanent injunction to prevent future violations of the FTC Act, the Telemarketing Act, and the TSR by Defendants;

14

3.      Award such relief as the Court finds necessary to redress injury to consumers resulting from the Defendants' violations of the FTC Act, the Telemarketing Act, and the TSR, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

4.      Award Plaintiff the costs of bringing this action, as well as any other equitable relief that the Court may determine to be just and proper.


Dated: May 6, 2015                          Respectfully submitted,


                                            JONATHAN E. NUECHTERLEIN
                                            General Counsel

                                            s/THOMAS M. BIESTY
                                            THOMAS M. BIESTY, Trial Counsel
                                            NY #4172896
                                            RUSSELL S. DEITCH
                                            Attorneys for Plaintiff
                                            FEDERAL TRADE COMMISSION
                                            600 Pennsylvania Avenue, NW, CC-8528
                                            Washington, DC 20580
                                            202-326-3043 (Biesty)
                                            202-326-3043 (Deitch)
                                            202-326-3395 (Facsimile)
                                            tbiesty@ftc.gov
                                            rdeitch@ftc.gov